UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

Nicholas McMillen,

    Plaintiff,

v.

International Junior Golf Academy (Bishops Gate) LLC,

    Defendant.

Case Number  5:21-cv-410

## Complaint & Jury Demand

**I. Preliminary Statement**

1. The Plaintiff, Nicholas McMillan, sues Defendant International Junior Golf Academy (Bishops Gate) LLC for unlawful retaliation in violation of Title IX and Fla. Stat. § 39.203(2)(b).

2. Defendant unlawfully retaliated against Plaintiff by firing him from his job following Plaintiff's reports of sexual harassment/discrimination by Defendant's owner against Defendant's minor female student enrollees.

3. The Honorable Court has original jurisdiction over Plaintiff's Title IX claim pursuant to 28 U.S.C. § 1331 as the claim arises under federal law. The Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to

1

28 U.S.C. § 1367 as the claim is so related to Plaintiff's federal claim that they form part of the same case or controversy.

4. Venue is proper as the acts and/or omissions forming the basis of Plaintiff's claims occurred in Lake County, Florida.

5. Plaintiff is a citizen of Florida.

6. Defendant is a Florida limited liability company operating as a golf boarding school in Lake County, Florida.

7. Plaintiff worked for Defendant in Lake County, Florida.

8. "Schools are entrusted with the paramount responsibility of educating youths, and within this 'in loco parentis' role, keeping them safe throughout the school day and while completing school activities."[1]

9. Adult Sexual Misconduct (ASM) includes conduct that is inappropriate, such as frontal hugging.

10. Federal regulators estimate that 1 in 10 K-12 students will experience sexual misconduct perpetrated by a school employee by the time they graduate

---

[1] *A Training Guide for Administrators and Educators on Addressing Adult Sexual Misconduct in the School Setting*. U.S. DEPARTMENT OF EDUCATION, OFFICE OF SAFE AND HEALTHY STUDENTS, READINESS AND EMERGENCY MANAGEMENT FOR SCHOOLS (REMS) TECHNICAL ASSISTANCE CENTER (March 2017). *Available online at* https://rems.ed.gov/docs/ASMTrainingGuide.pdf.

2

high school. Of the types of incidents reported, 79% involved physical contact, 14% involved non-physical contact and 8% involved both. One (1) in three (3) reported offenders had multiple victims.

II.     **Background**

11.     Defendant is a Florida Limited Liability Company incorporated in 2019 with its principal place of business located at 26605 Bella Vista Drive, Howey in the Hills, Florida.

12.     Defendant does business as "IJGA" and "IJGA Bishops Gate." *See* www.ijga.com.

13.     IJGA Bishops Gate is part of a network of junior golf academies with facilities located in Orlando, Florida, Albatross, India, and La Loma, Mexico.

14.     The IJGA Network of junior golf academies offers the following co-educational programs to its student clientele: golf boarding school, post graduate programs, weekly programs, golf camps, lifestyle programs, and gap year golf programs.

15.     The IJGA Network of junior golf academies markets their services to children as young as 10 years old. *See* www.ijga.com/camp/.

16. The IJGA Network of junior golf academies employs over 70 staff members who teach, coach sports, advise students, mentor, and live on campus as house parents. *See* www.ijga.com.

17. Defendant's "Lifestyle Program at Bishops Gate" is a "U.S. boarding experience living on the first class IJGA campuses, partnering with a private school for education." *See* www.ijga.com/lifestyle-program/.

18. Defendant is owned and operated by Andrew Summers.

19. Summers was born in Nigeria and raised in South Africa until his family moved to Edinburgh, Scotland in 1971. *See* www.ijga.com/ijga-owner-and-ceo-andrew-summers-featured-on-hilton-head-monthly-magazin/.

20. At age 50, Summers retired from his finance/investment management job.

21. In 2008, Summers convinced a local private school to partner with him in opening an international boarding sports academy in Hilton Head (Bluffton), South Carolina. *Id.*

22. Summers opened his Florida campus in 2014. *Id.*

23. Defendant's "Lifestyle Program at Bishops Gate" partners with Montverde Academy[2] in Monteverde, Florida to provide educational and athletic services to its student clientele. *See* www.ijga.com/lifestyle-program/.

24. In January 2020, the Hilton Head Monthly reported that "IJGA now has on the two campuses a total of about 150 teenagers from over 40 different countries who have left their homes and families behind to pursue their dreams of becoming champion golfers." *See* www.ijga.com/ijga-owner-and-ceo-andrew-summers-featured-on-hilton-head-monthly-magazin/.

25. Two months later, IJGA announced it would close its Old Carolina Campus effective May 2020. Bayless, Kacen. *The Island Packet* (March 13, 2020), *available online at* www.islandpacket.com/news/local/article241137301.html.

26. Tuition at Defendant's Bishops Gate campus averages more than $60,000 per year.

---

[2] The Monteverde Academy fired its Dean of Students in 2019 following allegations of unlawful sexual activity with a minor. According to news reports, detectives began investigating the allegations after a student told the headmaster about a possible a sexual relationship (even though the student and the accused denied the rumors). Sheets, Tess. "Monteverde Academy dean of students fired amid investigation into 'inappropriate relationship' with student." Orlando Sentinel (May 15, 2019), available online at
https://www.orlandosentinel.com/news/lake/os-lk-monteverde-academy-jerry-matos-improper-relationship-20190515-ziem4pnvobh3lmqqjvz7ga3fxm-story.html.

5

27. In April 2020, Defendant borrowed $575,902.00 in federal PPP loans.

28. In March 2021, Defendant borrowed another $575,902.00 in federal PPP loans.

29. Plaintiff worked for Defendant as *Director of Mental Performance* from June 2019 until his termination in July 2021.

30. In May 2021, a student council leader at IJGA Bishops Gate attended a team meeting at the school in which a discussion occurred concerning appropriate ways for Defendant's "student care team" (i.e., adult employees) to show affection to students in their charge.

31. The concerns of the student counsel leader were eventually reported to Gary Wise, an employee of Defendant and Plaintiff's colleague, during a golf game.

32. Specifically, Wise was asked if he knew about Summers "touching girls" and a male golfer mentioned to Wise that he was in possession of videotape evidence of inappropriate touching by Summers of female students.

33. Wise then reported the allegation to Plaintiff.

34. On May 12, 2021, Plaintiff spoke to Defendant's Head of Human Resources (Charles Gleydura) about the allegations that Summers inappropriately touched female students.

6

35. Specifically, Plaintiff informed Gleydura that two (2) minor boys alleged to Wise that a few girls in the academy had been touched inappropriately by Summers; that the boys did not feel comfortable with what Summers was doing with the girls, who are minors; that there were multiple witnesses of Summers touching girls on the side and near the chest while hugging; and that there was a video of something Summers did and/or said.

36. During the May 12, 2021, call, Plaintiff informed Defendant of his professional obligation to report the allegations to local law enforcement and DCF.

37. Summers was present during the May 12, 2021, call.

38. Defendant's management responded to Plaintiff that the company's internal investigation revealed the touching to be quite minor in nature. Defendant urged Plaintiff to conduct his own due diligence and check his facts before making any reports to the authorities.

39. Defendant's management specifically requested that Plaintiff wait 48 hours before reporting the allegations to the authorities.

40. On May 13, 2021, Defendant's management team closed their internal investigation of the allegations.

41. Defendant did not communicate the results of its investigation to Plaintiff.

42. At approximately 4:30 p.m., on Thursday, May 13, 2021, Plaintiff reported the allegations to Florida's Department of Child and Family (DCF) Services.

43. Specifically, Plaintiff reported the following to DCF:

    a. That Summers puts his hand on the ladies and girls in a manner they did not like.

    b. That Summers hands start on their shoulders and then he drags his hands down to just about the nipple area.

    c. That Summers hugs on girls that feel uncomfortable.

    d. That at least one person told Summers that she does not like it, and it felt inappropriate.

    e. That some of the boys were concerned about it enough to videotape it.

44. Defendant's internal investigation revealed that a couple of its female students were culturally and/or personally uncomfortable with the way they were touched by Summers.

45. Defendant asserts that the hugs and shoulder tapping by Summers were appropriate and consistent with IJGA policy.

46. On Wednesday, June 2, 2021, Plaintiff met with Gleydura again because he felt that his work environment had turned hostile because of his complaint to DCF. Specifically, Plaintiff complained that he was being harassed due to the fallout surrounding the DCF investigation.

47. On Thursday, July 1, 2021, Gleydura and Grant Balcke (Director of Golf Performance) met with Plaintiff to inform him that his position with the company was being eliminated.

48. Defendant terminated Plaintiff's employment on July 7, 2021.

49. In its July 7, 2021, termination letter to Plaintiff, Defendant explained:

> "We have [] never indulged in any disparagement or needless negativity concerning former employees, either in the marketplace or when speaking with parents and students. IJGA(BG) has come to expect the same from any of our former colleagues."

50. Defendant is a recipient of federal financial assistance as defined by 34 C.F.R. § 106.2(g).

51. Defendant operates a program or activity covered by Title IX as defined by 34 C.F.R. § 106.2(h)(3)&(4).

52. Defendant did not, prior to May 13, 2021, designate and authorize a Title IX coordinator as required by 34 C.F.R. § 106.8(a).

53. Defendant did not, prior to May 13, 2021, disseminate a Title IX policy as required by 34 C.F.R. § 106.8(b).

54. Defendant did not, prior to May 13, 2021, adopt or publish grievance procedures as required by 34 C.F.R. § 106.8(c).

55. Defendant fired Plaintiff, in whole or in part, because Plaintiff reported allegations of sexual harassment of minor students to Florida's Child Protective Services Hotline.

56. Defendant fired Plaintiff, in whole or in part, because Plaintiff reported allegations of sexual harassment of minor students to Defendant's management.

57. Defendant fired Plaintiff, in whole or in part, because Plaintiff informed Defendant of his statutory obligation to report suspected child abuse or neglect.

58. Plaintiff's complaint to Child Protective Services was made in good faith.

59. Plaintiff's complaint to Defendant's Human Resources Department about sexual harassment of female students was made in good faith.

60. Title IX prohibits sexual harassment of female students by their male teachers, coaches, and administrators.

61. Defendant's July 7th termination letter is an effort to intimidate, threaten coerce and/or discriminate against Plaintiff in violation of 34 C.F.R. § 106.71.

62. By retaliating against Plaintiff for making complaints about sexual discrimination/harassment, Defendant violated 34 C.F.R. § 106.51.

63. Upon information and belief, Summers was never disciplined for touching any of Defendant's female students.

64. Upon information and belief excluding Plaintiff, no member of Defendant's administration ever reported any allegations that Summers touched any of Defendant's female students to any member of law enforcement.

65. Upon information and belief excluding Plaintiff, no member of Defendant's administration ever reported any allegations that Summers touched any of Defendant's female students to any state or local authority prior to May 13, 2021.

66. Prior to July 1, 2021, more than one female student under the age of 18 had complained to Defendant that Summers had touched her in a way that made her feel uncomfortable at school.

11

67. Defendant's unlawful acts and omissions as described herein were willful, deliberate and intentional.

68. Defendant has a pattern and practice of tolerance and/or acquiescence in the misconduct alleged herein.

69. Defendant's own policies resulted in the violations of federal and state laws as alleged herein.

70. Defendant breached its duty to provide sufficient training and supervision to prevent the acts and omissions alleged herein.

71. Defendant, acting through its authorized agents, engaged in the tacit approval of the retaliatory conduct alleged herein, such that its deliberate indifference amounted to an official policy of inaction to prevent violations of federal and state law.

72. Under Title IX, schools are required to disseminate a policy against sex discrimination so that students and employees understand that sexual harassment will not be tolerated. 65 Fed.Reg. 66095 (2000).

73. "If a school does not have effective policies and procedures as required by the Title IX regulations, its own inaction may hamper early notification and intervention and may permit a sexually hostile environment to exist in its program and activities." 65 Fed.Reg. 66095 (2000).

74. Plaintiff has suffered actual and irreparable harm as a direct, natural and proximate result of Defendant's acts and omissions.

75. Because of Defendant's unlawful conduct, future allegations of sexual harassment, discrimination and/or abuse are likely to go unreported and/or underreported.

76. Under Federal Law, "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . ." 20 U.S.C. § 1681(a).

77. Although Title IX is not a criminal statute, the behaviors it prohibits may be criminal or non-criminal in nature.

78. In *Jackson v. Birmingham Board of Education*, the Supreme Court held that a private right of action for retaliation is implied by statute under Title IX. Writing for the majority, Justice O'Connor explained:

> Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private right of action. Retaliation is, by definition, an intentional act . . . . We conclude that when a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX.

544 U.S. 167 (2005).

79. In 2020, the U.S. Department of Education promulgated Final Rule Section 106.71 (effective August 4, 2020), which provides, in pertinent part, that:

> No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes retaliation.

34 C.F.R. § 106.71.

80. Florida's Child Protection Laws are intended "to provide for the care, safety, and protection of children in an environment that fosters healthy social, emotional, intellectual, and physical development; to secure and safe custody; to promote the health and well-being of all children under the state's care; and to prevent the occurrence of child abuse, neglect, and abandonment." Fla. Stat. § 39.001(1)(a).

81. The Florida Legislature recognized that "the incidence of known child abuse, abandonment, or neglect has increased rapidly . . ." Fla. Stat. §

14

39.001(8). Moreover, "the impact of that abuse, abandonment, or neglect has on the victimized child, siblings, family structure, and inevitable on all citizens of the state has cause the Legislature to determine that the prevention of child abuse, abandonment, and neglect shall by a priority of [Florida]." *Id.*

82. It is the purpose of the Florida Legislature that children be protected from "abuse, abandonment, neglect, and exploitation." Fla. Stat. § 39.001(3)(a).

83. Under Florida Law, "abuse" means "any willful act or threatened act that results in any physical, mental, or sexual abuse, injury, or harm that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired." Fla. Stat. § 39.01(2). Abuse includes both "acts" and "omissions." *Id.*

84. The Florida Legislature expects that its Child Protection Statutes will be "liberally interpreted and construed" by the courts "in conformity with its declared purposes." Fla. Stat. § 39.001(12).

85. Under Florida Law, "any person who knows, or has reasonable cause to suspect, that a child is abused, abandoned, or neglected by a parent, legal custodian, caregiver, or other person responsible for the child's welfare . . . shall report such knowledge or suspicion to the department . . ." Fla. Stat. § 39.201(1)(a).

15

86. Under Florida Law, "any person who knows, or who has reasonable cause to suspect, that a child is abused by an adult other than a parent, legal custodian, caregiver, or other person responsible for the child's welfare . . . shall report such knowledge or suspicion to the department . . ." Fla. Stat. § 39.201(1)(b).

87. Under Florida Law, "each report of known or suspected child abuse, abandonment, or neglect by a parent, legal custodian, caregiver, or other person responsible for the child's welfare . . . shall be made to the department's central abuse hotline." Fla. Stat. § 39.201(2)(a).

88. Florida Law provides:

> No resident or employee of a facility serving children may be subjected to reprisal or discharge because of his or her actions in reporting abuse, abandonment, or neglect pursuant to the requirements of this section.

Fla. Stat. § 39.203(2)(a).

90. Moreover, any person making a report under Florida's Child Abuse Statutes "shall have a civil cause of action for appropriate compensatory and punitive damages against any person who causes detrimental changes in the employment status of such reporting party by reason of his or her making such report." Fla. Stat. § 39.203(2)(b).

91. Likewise, "any detrimental change made in the residency or employment status of such person, including, but not limited to, discharge, termination, demotion, transfer, or reduction in pay or benefits or work privileges, or negative evaluations within a prescribed period of time *shall establish a rebuttable presumption that such action was retaliatory.*" *Id.*

92. The law was intended "to protect those who might be overzealous in protecting children from potential abuse" not "those who fail to fulfill their duty to protect children." *Floyd v. Dep't of Children & Families*, 855 So. 2d 204, 206 (Fla. 1st DCA 2003); *see also Norman v. Bright Horizons Family Solutions, LLC*, 2014 U.S. Dist. LEXIS 8424 (M.D. Fla. Jan. 23, 2014).

### III. Claims

**Count I – Title IX Retaliation**

93. Plaintiff reincorporates and adopts the allegations set forth in paragraphs 1 – 92 as if fully set forth herein.

94. Defendant is a "recipient or other person" covered by 29 C.F.R. § 106.71.

95. Defendant is in a covered partnership with a "recipient or other person" (i.e., Monteverde School) as contemplated by 29 C.F.R. § 106.71 and the regulations implementing Title IX.

17

96. Plaintiff is an "individual" protected by 29 C.F.R. § 106.71.

97. Plaintiff engaged in protected activity covered by 29 C.F.R. § 106.71 when he reported suspected sexual discrimination/harassment of minor female students to Defendant's Human Resources Department, the State of Florida, and to the Florida Child Protective Services Hotline.

98. Defendant terminated Plaintiff's employment because Plaintiff engaged in activities protected by 29 C.F.R. § 106.71.

99. Defendant attempted to intimidate, threaten, coerce and/or discriminate against Plaintiff because he engaged in activities protected by 29 C.F.R. § 106.71.

100. The unlawful actions taken by Defendant against Plaintiff were motivated, in whole or in part, by Plaintiff's good faith complaints about unlawful sex discrimination and harassment within Defendant's school.

101. Plaintiff suffered harm and continues to suffer harm as a result of Defendant's unlawful conduct.

Wherefore, Plaintiff demands trial by jury, judgment in his favor and against Defendant for violations of Title IX of the Education Amendments of 1972, an entry of an order awarding all actual and compensatory losses, an entry

of an order prohibiting Defendant from engaging in further unlawful conduct, reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

**Count II – Fla. Reporting Child Abuse Retaliation**

102. Plaintiff reincorporates and adopts the allegations in paragraphs 1 – 92 as if fully set forth herein.

103. At all times relevant, Plaintiff was Defendant's employee.

104. Defendant is a facility serving children.

105. Plaintiff reported suspected child abuse to Florida's Child Abuse Hotline on May 13, 2021.

106. In July 2021, Defendant fired Plaintiff because he made a report under Florida's Child Abuse Statutes.

107. In July 2021, Defendant threatened Plaintiff because he made a report under Florida's Child Abuse Statutes.

108. Defendant's conduct towards Plaintiff violates Fla. Stat. 39.203(2)(a) and (b).

109. Plaintiff suffered harm and continues to suffer harm as a result of Defendant's unlawful conduct.

Wherefore, Plaintiff demands trial by jury, judgment in his favor and against Defendant for violations of Fla. Stat. 39.203(2)(a) and (b), entry of an

order awarding all actual and compensatory losses, entry of an order awarding punitive damages in an amount to sufficient to punish Defendant and deter Defendant from future retaliatory conduct taken to thwart acts to protect minor children, and all such other relief available in law and equity.

Respectfully submitted this 10th day of August 2021,

/s/ *Bernard R. Mazaheri*
Bernard R. Mazaheri
Florida Bar Number 643971
Mazaheri & Mazaheri
325 Shelby Street
Frankfort, Kentucky 40601
Tel – (502) 475-8201
Email – bernie@thelaborfirm.com